UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LUIS ANGEL RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 19-10116-LTS |
| | ) | |
| BOSTON PUBLIC SCHOOLS and | ) | |
| SHAUN O. HARRISON, individually and | ) | |
| in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ORDER ON CITY OF BOSTON'S
MOTION FOR SUMMARY JUDGMENT (DOC. NO. 53)

February 25, 2022

SOROKIN, J.

On March 3, 2015, a terrible crime occurred.  Luis Angel Rodriguez, a Boston Public

Schools ("BPS") student at the time, was shot in the back of the head by then BPS employee

Shaun Harrison.  The shooting occurred after Harrison solicited Rodriguez to sell drugs to other

BPS students; Rodriguez did sell drugs for Harrison and then Harrison accused Rodriguez of

stealing some of the drugs.

Rodriguez miraculously survived the shooting and sued both BPS and Harrison for the

harm he suffered.  In addition to federal claims and a claim brought under the Massachusetts

Declaration of Rights, Harrison brought several tort claims against BPS.  Doc. No. 21 at 4-5.

BPS subsequently moved to dismiss the claims against it, including those asserted against

Harrison in his official capacity.  Doc. No. 11.[1]  The Massachusetts Tort Claims Act includes a

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing

strict two-year presentment requirement for claims brought against public employers.  See Doc.

No. 21 at 6 (explaining the presentment requirement).  Because the record established that

Rodriguez failed to present his claims within the two-year window, the Court dismissed his

negligence claims.  Id. at 6-7.  In so ruling, the Court did not reach the merits of the negligence

claims against BPS.  Id.  The Court also dismissed the remaining claims against BPS with the

exception of the Plaintiff's 42 U.S.C. § 1983 claim, which is based on BPS's alleged failure to

sufficiently supervise, monitor, control, or discipline Harrison.  Id. at 8-10.  The claims against

Harrison in his individual capacity remained.  Id. at 5 n.5.   After the Court's Order on the

Motion to Dismiss, Harrison defaulted.  Doc. No. 30.  BPS filed the present Motion for

Summary Judgment on the sole remaining claim under § 1983, which Rodriguez opposed.

I.       BACKGROUND

        The Court describes the facts pursuant to the familiar summary judgment standard

described infra.

        A.       Harrison's Employment History

        BPS first hired Harrison in 2008 to fill a part-time afterschool support role at Excel High

School in South Boston.  Statement of Material Facts ("SOMF"), Doc. No 58 ¶ 1.  Harrison

worked at Excel from 2008 to 2010.  Id. ¶ 2.  Excel did not receive any reports of inappropriate

behavior by Harrison during his time there.  Id.  In 2010, Harrison became a full-time BPS

employee when he was hired as a "Paraprofessional – In school Suspension Coordinator," a

union position, at Odyssey High School.  Id. ¶ 3.  Harrison worked at Odyssey without any

recorded disciplinary or behavioral issues until he was laid off when the school closed in 2011.

Id.  After Odyssey closed, Harrison was hired as a Community Field Coordinator, another union

_____

system, and pincites are to the page numbers in the ECF header.

position, at Boston Green Academy ("BGA").  Id. ¶ 10.  BGA is an in-district charter school that

was opened in the space previously occupied by Odyssey.  Id. ¶ 8.  Harrison worked at BGA

from 2011 to 2014.  Id. ¶ 10.

        B.       The Disciplinary Matters

BPS's employee discipline procedures use a "progressive scheme," which establishes

five successive layers of discipline: "(1) oral warning; (2) written warning; (3) written

reprimand; (4) suspension; and (5) dismissal."  Id. ¶¶ 4-5; Doc. No. 54-3, Ex. B at 2.  According

to the procedures, "these progressive levels, or steps, generally should be followed in sequence,

unless the seriousness of the offense warrants otherwise."  Doc. No. 54-3, Ex. B at 2.  The

procedures further state:

> the degree of discipline should always reflect the seriousness of the offense.  Thus,
> notwithstanding the School Department's adherence to the principles of
> progressive discipline, where misconduct in the first instance constitutes a serious
> offense, such as conduct that constitutes a violation of the law or is so egregious
> that by its very nature it constitutes a serious offense, the lesser degrees of discipline
> should be by-passed and a more severe disciplinary measure should be applied[.]

Id. at 6.  Examples of such serious offenses include "theft or destruction of school department

property or threatening or violent behavior or harassment of a supervisor, student, or co-worker."

Id.  The policy also allows past warnings to be taken into consideration when determining

whether a more severe consequence should be imposed.[2]  Id.

---

[2] The Plaintiffs also point out the BPS had the following policies in place that relate to
discrimination, sexual harassment, and child abuse and neglect: (1) a 2014-2015 "Non-
discrimination and Zero Tolerance Policy," which states that discrimination "shall be viewed as
serious misconduct and shall result in discipline, up to and including termination" (Doc. No. 58-
7, Ex. 6 at 2); (2) a 2014-2015 Sexual Assault Policy that sets forth disciplinary procedures to be
followed in sexual assault matters (Doc. No. 58-8, Ex. 7); and a 2011-2012 and 2014-2015 Child
Abuse and Neglect policy (Doc. No. 58-9, Ex. 8).

The parties agree that there were two "documented disciplinary matters" involving

Harrison during his time at BGA, both of which occurred in November of 2012.  SOMF, Doc.

No. 58 ¶ 11.  The progressive discipline levels described above were in place at the time of these

incidents.  Id. ¶ 7.

The first incident involved an allegation that Harrison pushed a female student in the

back and threw a roll of tape at her in an attempt to hit her.  Id. ¶ 11.  In response, BGA's

Headmaster issued a written warning advising Harrison that "professional behavior of this sort is

not acceptable and will not be tolerated."  Doc. No. 54-5, Ex. D at 2.  The warning determined

that Harrison "did throw a roll of tape at the student, which could not be construed in any other

way than as an attempt to hit her."  Id.  According to a report conducted after the shooting by

BPS's Office of Labor relations ("OLR Report"), the Headmaster also found that: (1) the

pushing allegation was unsubstantiated based on testimonial evidence[3] (Doc. No. 54-2, Ex. A at

3), (2) the student threw the tape first and Harrison threw it back without "the intention of

hurting her"[4] (Doc. No. 58-3, Ex. 2 at 3), and (3) Harrison and the student had a "friendly

relationship that sometimes crossed the line on both sides and this was one such instance" (id.).

According to the second allegation, "Harrison sexually harassed two students and openly

discussed recreational drug use with various students at different times."  Doc. No. 58-3, Ex. 2 at

4; SOMF, Doc. No. 58 ¶ 11; Doc. No. 54-6, Ex. E at 2-3; Doc. No. 54-2, Ex. A at 3.

---

[3] The Plaintiff objects to the Defendant's reliance on the findings in the OLR Report that certain parts of the allegations against Harrison were unsubstantiated, but has failed to introduce evidence to refute such findings.  SOMF, Doc. No. 58 ¶ 12-13.  Whether or not the Headmaster's conclusions were correct, it is undisputed that the Headmaster determined that certain aspects of the allegations were unsubstantiated and there is no evidence in the record that tends to suggest that the allegations were treated as fully substantiated.

[4] This finding comes from a different version of the OLR Report submitted by the Plaintiff and watermarked "DRAFT."  Doc. No. 58-3, Ex. 2.  The Court refers to this version of the OLR Report as the "Draft OLR Report."

Specifically, the Draft OLR Report states that Harrison allegedly told a female student that she had "'big-ass red juicy lips' and he allegedly commented on a male student's body and attire by stating 'I'll spank him' and 'his ass looks good.'"  Doc. No. 58-3, Ex. 2 at 3.  Harrison was also accused of stating, in response to students discussing marijuana, "[i]nvite me when y'all are doing that" and "[y]'all better not be rollin' up without me."  Doc. No. 54-6, Ex. E at 2.  Following an investigatory meeting, the Headmaster found that Harrison made the inappropriate statements, but that the drug-related comments were not sufficiently substantiated.[5]  Doc. No. 54-2, Ex. A at 3; Doc. No. 54-6, Ex. E at 2.  One of the reasons why the Headmaster deemed the statements related to recreational drug use unsubstantiated was because Harrison was not at school on the day that one of the comments was allegedly made.  Doc. No. 58-10, Ex. 9 at 3-4.  After this incident, the Headmaster issued Harrison a written reprimand.  SOMF, Doc. No. 58 ¶ 12; Doc. No. 54-6, Ex. E at 3.  The reprimand required, among other things, that Harrison attend sensitivity training and weekly meetings to receive coaching on appropriate boundaries.  Doc. No. 54-6, Ex. E at 3.  Harrison appealed this reprimand, but it was upheld by BGA's Board of Trustees.[6]  SOMF, Doc. No. 58 ¶ 14.

---

[5] See supra note 3.

[6] The Plaintiff contends that the documented disciplinary incidents were part of a pattern of unprofessional behavior.  He points to an article in the Boston Herald in which Molly Schen, the former Chairwoman of the Board of Trustees for BGA, was quoted saying Harrison "wasn't that great at calming a situation down," that "[s]ometimes when we wanted him to de-escalate, he would actually do the opposite," and that BPS informed BGA that Harrison could not be removed.  Doc. No. 58-3, Ex. 2 at 4; Doc. No. 58-4, Ex. 3 at 2.  According to the Draft OLR Report, Schen confirmed her statements regarding Harrison's tendency to escalate situations, but "vehemently denied the statement that BGA was rebuffed by BPS when they wanted to fire Harrison."  Doc. No. 58-3, Ex. 2 at 4.  Ms. Schen reported instead that BPS informed BGA that there was nothing further that could be done in light of the evidence discovered by the Headmaster.  Id.

Two years after the incidents, BGA "excessed" Harrison's appointment at the end of the

2013-2014 school year by exercising its hiring autonomy as an in-district charter school.  Id. ¶

15.  In other words, both the Headmaster and Harrison's supervisor, the Director of Student

Support, opted not to renew his contract.  Id; Doc. No. 54-2 at 4.  According to Harrison's April

2013 BGA performance evaluation, Harrison received an overall rating of "meets or exceeds

standards" and a professionalism rating of "does not meet standards" due, in part, to the tape-

throwing incident.  Doc. No. 58-5, Ex. 4 at 2, 7.  The evaluation recommended that Harrison

"identify his emotional triggers" through regular meetings with an administrative director and

request assistance when students behave inappropriately.  Id.  The stated reason for Harrison's

non-renewal was that he "was not performing at the levels [BGA] expected of him."  Doc. No.

54-2, Ex. A at 4.  The Draft OLR Report also notes BGA's concerns regarding Harrison's

professionalism, poor judgment, and poor interventions with students.  Doc. No. 58-3, Ex. 2 at 5.

Harrison was then placed at Orchard Gardens School in August of 2014 pursuant to the union

contract and the paraprofessional assignment process. [7] SOMF, Doc. No. 58 ¶ 15.

---

[7] The parties dispute whether there were complaints made against Harrison during his time at
Orchard Gardens.  While the Defendant denies such complaints, the Plaintiff points to a Boston
Globe article in which an anonymous staff member stated that Harrison "was spoken to several
times for talking to students too harshly," was not allowed to be alone with students or take them
to the bathroom, was often absent, and "made passes at colleagues."  Doc. No. 58-3, Ex. 2 at 5.
The OLR Report notes that the Principal of Orchard Gardens denied receiving complaints about
Harrison.  Id.

The Boston Globe article is inadmissible hearsay.  Fed. R. Ev. 802.  First, the quote from the
anonymous staff member is hearsay and does not fall within an exception.  The hearsay
exclusion applicable to opposing party statements, see Fed. R. Ev. 801(d)(2), does not apply
because the staff member spoke anonymously and thus the Plaintiff has not met his burden to
establish that the statement was "on a matter within the scope of [the agency or employment]
relationship and while it existed."  Fed. R. Ev. 801(d)(2)(E).  Even assuming that the statement
of the anonymous source is admissible, the Plaintiff relies on the newspaper article, which
creates another level of hearsay.  Because there is no hearsay exception that applies to the article,

C.      Harrison's Employment at Boston English School

Soon after Harrison's transfer to Orchard Gardens, the position of "Dean of Academies

Staff Assistant" opened at Boston English.  Id. ¶ 19.  The Dean's responsibilities are not entirely

clear based on the present record.  Though the Defendant describes the role as a "low-level

position responsible for student safety and development" (id.), the job description is expansive

and charges the Dean with, among other things: "implementing interventions that support our

students," maintaining a record of school climate referrals, holding meetings to resolve school

climate issues, leading restorative and peer-mediation practices, offering professional

development, and providing the Headmaster with data on school climate and culture.  Doc. No.

54-9, Ex. H at 2.  The Dean position had a salary of $35,000 per year.  SOMF, Doc. No. 58 ¶ 20.

Harrison applied for the position and provided contacts within the Boston Police

Department and other references, which "checked out."[8]  Doc. No. 54-8, Ex. G, Answer No. 7;

SOMF, Doc. No. 58 ¶ 22.  The Headmaster of Boston English, Ligia Noriega-Murphy, had

previously hired Harrison to work at Excel and advocated for his candidacy.  Id. ¶ 23.

Ultimately, the Boston English Hiring Committee recommended Harrison for the position

without knowledge of the documented disciplinary matters that occurred at BGA in 2012.  Id. ¶

25.

Rodriguez was 17 years old at the time of the shooting and a sophomore at Boston

English.  Id. ¶ 28.  Rodriguez first met Harrison when he was sent to Harrison's office for

---

both the article and the statement contained therein are inadmissible.  Finally, even if the facts
contained in the article are admissible, they do not alter the Court's legal analysis or conclusions.
[8] The Plaintiff disputes the Defendant's assertion that Harrison's references "checked out"
because the meaning of "checked out" is unclear and there are no records memorializing Boston
English's conversations with the references.  SOMF, Doc. No. 58 ¶ 22.  The Plaintiff has failed
to support his objection with evidence suggesting that the references did not check out or
otherwise yielded concerning information.

counseling.  Id. ¶ 30; Doc. No. 58-14, Ex. 13 at 31:18-32:4.  Like the school, Rodriguez was

unaware of Harrison's disciplinary background.  SOMF, Doc. No. 58 ¶ 29.  Rodriguez began

selling marijuana for Harrison soon after they met and, later, learned that Harrison was a member

of the Latin Kings gang.  Id. ¶¶ 34-35.  Rodriguez never told any school officials that he was

selling marijuana for Harrison nor that he acted inappropriately during their meetings.  Id. ¶¶ 32,

36.  There is no evidence that BPS supervisors knew of this activity or were in any way warned

or on notice of such activity.

A couple days before the shooting, Harrison accused Rodriguez of stealing three "dime

bags" of marijuana from him, which Rodriguez denied.  Id. ¶ 37.  On March 3, 2015, Rodriguez

was "ambushed" in the school bathroom by another student who sold drugs for Harrison.  Id. ¶

38.  According to Rodriguez, Harrison witnessed the fight but did not respond until other people

ran in.  Id.  In his deposition, Rodriguez described the ambush as a set-up orchestrated by

Harrison.  Id.; Doc. No. 58-14, Ex. 13 at 103:13-18.  Harrison escorted Rodriguez to the

Headmaster's office after the fight broke up.  SOMF, Doc. No. 58 ¶ 40.

On their way to the Headmaster's office, Harrison and a female student got into an

argument.  According to Rodriguez: "[Harrison] called her some names, and she – she just

started yelling at him back, and that's when he, like, grabbed her. And she was, like, 'Get off of

me.' And then he, like, he spit in her face."  Id. ¶ 41; Doc. No. 58-14, Ex. 13 at 110:15-20.  A

BPS Officer who witnessed the argument stated that Harrison told the female student that he

would "smack the shit out of" her and pushed her.  Id. ¶ 42; Doc. No. 54-13, Ex. L at 2.

After school that day, Harrison sent Rodriguez a text asking if he wanted to hang out.

SOMF, Doc. No. 58 ¶ 47.  Rodriguez agreed, not yet suspecting that Harrison was responsible

for the bathroom ambush.  Id. ¶ 46.  Harrison and Rodriguez met around 7:15pm at the Sunoco

station on Massachusetts Avenue in Newmarket Square.  Id. ¶ 48.  Harrison borrowed

Rodriguez's phone to make a call and, while he was speaking, shot Rodriguez in the back of the

head.  Id. ¶ 49.

> D.      The Firing

That same day (March 3, 2015), Headmaster Noriega-Murphy learned about the

altercation between Harrison and the female student.  Doc. No. 54-8, Ex. G, Answer No. 3.  She

then sent Harrison written notice of the allegation and instructed him to report back to school the

next morning for a termination hearing.  Id.  Later that night, Noriega-Murphy found out that

Rodriguez had been shot, but not by whom.  Id.

On March 4, 2015, the day after the shooting and the ambush in the bathroom, Noriega-

Murphy met with Harrison.  SOMF, Doc. No. 58 ¶ 43.  Harrison feigned a medical emergency

when she informed him that Rodriguez had been shot.  Doc. No. 54-8, Ex. G, Answer No. 3.

Due to this supposed medical emergency, Noriega-Murphy rescheduled Harrison's hearing for

the following day.  Id.  It was not until the evening of March 4 that Noriega-Murphy learned that

Harrison was responsible for the shooting.  Id.  She was advised by the Boston Police

Department to "conduct the termination hearing the next day, not to inform Mr. Harrison, and to

keep Mr. Harrison at school for the day while they investigated the matter."  Id.

On March 5, 2015, the Superintendent of BPS sent Harrison a letter dismissing him

effective immediately.  SOMF, Doc. No. 58 ¶ 44.  The termination letter cited the verbal and

physical altercation with the female student that occurred the day before as the basis for

Harrison's dismissal.  Id. ¶ 45; Doc. No. 54-15, Ex. N at 2.

E.      The Aftermath

BPS's Office of Labor Relations investigated Harrison's employment in the aftermath of

the shooting.  Doc. No. 54-2, Ex. A; Doc. No. 54-14, Ex. O.  In the course of the investigation,

students came forward with accounts of Harrison discussing marijuana use with students and

allowing them to bring marijuana to school.  SOMF, Doc. No. 58 ¶ 51; Doc. No. 54-16, Ex. O.

In addition to the internal OLR Report, BPS commissioned an external report to assess

Harrison's employment history and document missed warning signs.  Doc. No. 58-10, Ex. 9.

The report recommends implementing a system to "recogniz[e] and report[] allegations of

inappropriate interactions between employees and students" because "[t]here appears to be no

standard process for tracking inappropriate behavior as employees move from one work site to

another."  Id. at 4; see also id. at 6-7 (explaining that Boston English was not aware of Harrison's

disciplinary issues when they hired him and, as a result, he was selected from over 40 applicants

to fill the Dean role).  The report concludes by stating that "there does not appear to be a specific

signal that would have predicted [Harrison's] alleged criminal behavior . . . . He had been praised

by co-workers, public clergy and the police department for his community work."  Id. at 8.

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the

burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v.

Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).  A court may enter summary judgment "against a party who

10

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).

On a motion for summary judgment, courts are "obliged to view the record in the light

most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  At the same

time, courts may not credit "conclusory allegations, improbable inferences, and unsupported

speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008).

IV.     DISCUSSION

The Plaintiff's sole remaining claim is brought under § 1983 and alleges that BPS failed

to sufficiently supervise, monitor, control, or discipline Harrison.  Doc. No. 21 at 9.  Monell v.

Department of Social Services held that municipalities may be held liable for the

unconstitutional acts of their employees, but not under a theory of respondeat superior.  436 U.S.

658 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

"Assessing liability against the City requires two basic elements: first, that plaintiff's

harm was caused by a constitutional violation, and second, that the City be responsible for that

violation, an element which has its own components." Young v. City of Providence ex rel.

Napolitano, 404 F.3d 4, 25-26 (1st Cir. 2005).  Because neither party's brief addresses the first

element, the Court assumes without deciding that the Plaintiff has established a constitutional

violation.  The second element sets a "very high bar for assessing municipal liability" to prevent

de facto respondeat superior.  Young, 404 F.3d at 26 (1st Cir. 2005).  The Plaintiff must show:

(1) that the unconstitutional conduct resulted from a municipal policy or custom, (2) that such

policy or custom actually caused the injury, and (3) "that the municipality possessed the requisite

level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'"  Id.

Under the stringent deliberate indifference standard of fault, a municipal actor may be found

liable only when it "disregarded a known or obvious consequence of [its] action."  Connick v.

Thompson, 563 U.S. 51, 131 (2011); see also Manarite By & Through Manarite v. City of

Springfield, 957 F.2d 953, 956 (1st Cir. 1992) (second alteration in original) (quoting DeRosiers

v. Moran, 949 F.2d 15 (1st Cir.1991)) ("While [deliberate indifference] can aptly be described as

'recklessness,' it is recklessness not in the tort-law sense but in the appreciably stricter criminal-

law sense, requiring actual knowledge [or willful blindness] of impending harm, easily

preventable.").

The Plaintiff's deliberate indifference theory is grounded in the Defendant's failure to

implement a standard process for tracking the disciplinary records of BPS employees who

transfer between schools, which allegedly enabled Harrison to secure a job at Boston English

despite his disciplinary record at BGA.  Doc. No. 57 at 10.  In addition, the Plaintiff contends

that the Defendant's failure to fire or otherwise adequately discipline, supervise, or train

Harrison after the allegations of misconduct constituted deliberate indifference.  Id. at 10-11.

The Defendant raises several arguments in support of its Motion.  First, the Defendant contends

that neither BGA nor Boston English demonstrated deliberate indifference towards the Plaintiff's

rights.  Doc. No. 54 at 16.  In Defendant's view, BGA officials undertook a thorough

investigation of the allegations against Harrison and imposed appropriate sanctions, and Boston

English had no notice of Harrison's disciplinary record when it hired him.  Id.  Next, the

Defendant argues that the Plaintiff has failed to demonstrate the existence of a pattern of

constitutional violations that are causally connected to the harm that he suffered.  Id. at 16-17.

Finally, the Defendant points out that the deliberately indifferent action must be taken by an

official with "policy-making authority" to satisfy Monell and neither the Headmaster of BGA

nor Boston English have such authority under Massachusetts law.  Id. at 18-20.

       A.      Deliberate Indifference Arising Out of Defendant's Failure to Adequately

                Discipline Harrison

The Court turns first to the Plaintiff's theory that the Defendant's failure to adequately

discipline Harrison after he was accused of misconduct at BGA amounted to deliberate

indifference.  Though the Plaintiff undeniably suffered great harm, this theory of municipal

liability fails for three reasons.

First, the Plaintiff has not pointed to a policy, practice, or custom that resulted in his

injury.  A policy or custom attributable to the city "must be so well settled and widespread that

the policymaking officials of the municipality can be said to have either actual or constructive

knowledge of it yet did nothing to end the practice."  Bordanaro v. McLeod, 871 F.2d 1151,

1156 (1st Cir. 1989).  The Plaintiff does not challenge the written discipline policy.  If the BGA

Headmaster deviated from the policy, there is no evidence that such a deviation was part of a

policy, practice, or custom.  Thus, the Plaintiff fails to establish that BPS has a widespread policy

or custom of inadequate disciplinary processes.  See Trinidad v. City of Bos., No. CIV.A 07-

11679-DPW, 2010 WL 2817186, at *11 (D. Mass. July 16, 2010) ("[Plaintiff] failed to produce

any evidence of the City's failure to supervise and discipline its officers and investigate incidents

related to the misconduct of its officers other than the allegations involving [defendant].  In

failing to do so, [plaintiff] falls short of showing that such failure was so widespread or so well-

settled as to be a custom or practice.").

The Plaintiff's theory also fails because there is insufficient evidence in the record to allow a reasonable jury to conclude that BPS's response to Harrison's misconduct constituted deliberate indifference.  The undisputed evidence establishes that BPS officials investigated and then disciplined Harrison after each allegation of misconduct.  After the first allegation, the BGA Headmaster issued Harrison a written warning informing him that such conduct would not be tolerated.  Doc. No. 54-5, Ex. D.  The second allegation prompted a written reprimand, which required Harrison to engage in sensitivity training and attend weekly meetings with the Director of Student Support Services.  Doc. No. 54-6, Ex. E.  Boston English fired Harrison after the final allegation involving the verbal and physical altercation with the female student on the day of the shooting.  SOMF, Doc. No. 58 ¶ 44.  Whether or not one might disagree with the Defendant's response, the response simply does not qualify as deliberate indifference under the "exceptionally stringent" standard.  Young, 404 F.3d at 30.  The record establishes that BPS responded to each allegation, informed Harrison that his conduct was unacceptable, and took actions to discipline and correct him.  See Doe v. D'Agostino, 367 F. Supp. 2d 157, 170 (D. Mass. 2005) (finding that a school official's conduct did not satisfy the deliberate indifference standard when he investigated and responded to complaints against an employee).

Finally, there is insufficient evidence of a causal link between the alleged failure to adequately discipline Harrison and the ultimate injury.  "A plaintiff must show 'a direct link between the municipality's policy and the constitutional violation.'"  Armstrong v. Lamy, 938 F. Supp. 1018, 1035 (D. Mass. 1996) (quoting Bowen v. City of Manchester, 966 F.2d 13, 18 (1st Cir.1992)); see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 412 (1997) ("[A] finding of culpability . . . . must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff.").  BPS responded to each

14

allegation and, in the second case, BPS imposed both disciplinary and corrective measures. This response, even if inadequate, was not the "cause" of a violation of the Plaintiff's bodily integrity (the underlying constitutional violation for purposes of this motion).

   B.    <u>Deliberate Indifference Arising Out of Defendant's Hiring Process</u>[9]

   Next, the Plaintiff contends that "BPS policy and customs deprived the English High School Assistant Superintendent from knowing about Harrison's history of assaults and harassment, information she freely admitted would have prevented her from ever hiring Harrison in the first place." Doc No. 57 at 10. Specifically, there was no attempt by Boston English officials to check Harrison's disciplinary record at other in-district schools, nor was there a general BPS policy of doing so. Once again, the Court finds that this theory cannot support Plaintiff's § 1983 claim.

   The Supreme Court has warned that "where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record . . . there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself." <u>Brown</u>, 520 U.S. 397, 410. To avoid de facto respondeat superior, courts must "must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." <u>Id.</u> It is an open question whether a single hiring decision can give rise to municipality liability under <u>Monell</u>. <u>Young</u>, 404 F.3d at 30. If it can, the Supreme Court has suggested that the Plaintiff must show that the injury was a "plainly obvious consequence" of the hiring decision. <u>Id.</u> (quoting <u>Brown</u>, 520 U.S. 397, 412-13). Moreover, a "pattern of previous bad hiring decisions leading to constitutional violations

---

[9] The Court here assumes for summary judgment purposes, without deciding, that the process resulting in Harrison working at Boston English constituted a hiring-type process.

(perhaps of the same type as the one at issue) would likely be necessary to get one outside the 'single incident' analysis[.]" Id. at 31.

The Plaintiff's claim fails under either the single- or multiple-incident hiring standard. There is no evidence in the current record of a pattern of previous hiring decisions by BPS resulting in unconstitutional conduct. To the contrary, the facts presented suggest that BPS undertook a reasonably thorough review of Harrison's application, relying on Headmaster Noriega-Murphy's personal knowledge of him as well as his references. See Young, 404 F.3d at 31 (finding that the city's hiring decision was not deliberately indifferent when it performed a background check, checked the applicant's record, and confronted previous allegations of excessive force by the applicant). "That procedures were flawed does not make [BPS] deliberately indifferent to the risk" that Harrison would commit unconstitutional conduct. Id. The record simply did not suggest that a constitutional violation would occur or anything reasonably close to it. Indeed, the incidents of misconduct were years in the past and, as noted, addressed. Thus, the Plaintiff's second theory of liability must also fail.

IV.     CONCLUSION

In light of the findings above, the Court need not reach the Defendant's argument regarding final policymaking authority.

Accordingly, the Defendant's Motion for Summary Judgment (Doc. No. 53) is ALLOWED for the reasons stated previously.

The Plaintiff shall file a status report within fourteen days explaining how he wishes to proceed as to the claims against Harrison in his individual capacity.  While a default has entered, the Plaintiff has not yet obtained judgment against Harrison.

SO ORDERED.

 /s/ Leo T. Sorokin

Leo T. Sorokin
United States District Judge